[No. 2129.]

JACOB SCHUESSLER *v.* THE STATE.

PRACTICE — NEW TRIAL — INSANITY.— In a trial for burglary the defendant prevented his counsel from setting up the defense of insanity, but some evidence of that defense was elicited at the trial, and the motion for a new trial exhibited material and newly-discovered evidence of the same character. *Held*, that a new trial should have been granted, notwithstanding there was no diligence used to obtain the newly-discovered evidence at the trial.

APPEAL from the District Court of Mason. Tried below before the Hon. A. W. Moursund.

This appeal is prosecuted from a conviction for burglary, and a judgment in accordance with the verdict, which assessed the penalty at a term of five years in the penitentiary. The indictment charged the burglary of the dwelling-house of August Apelt, in Mason

county, Texas, on the 10th day of June, 1884, and the theft there-from of certain personal property of said August Apelt, consisting of one gold breast-pin, one pair of cuff buttons, one jack-plane, four towels, and one six-shooter.

August Apelt was the first witness for the State. He testified that he lived in Mason county, Texas, about five miles northeast from the town of Mason. He was acquainted with the defendant, whom he identified in court. The witness, in company with his wife, left his home on the 10th day of June, 1884, in the morning, to spend the day at the house of a neighbor. Leaving home he closed all of the doors to his house, and saw that all of the windows were down. On his return that evening he found one of the windows raised, and the articles stored in the house were scattered about in great confusion. Investigation disclosed that several articles had been taken from the house, and among them, which witness then missed, were a suit of clothes, a half sack of coffee, a jack-plane, a gold breast-pin, a pair of sleeve buttons, a clothes brush, four towels, some knitting cotton, and a lady's overcoat which belonged to his wife. Witness then proceeded to search for indications of the presence of an intruder, and found foot-prints about the place made by someone walking in stocking-feet. The witness and Fritz Lei-fester followed this track from the house through a small field, for about four hundred yards, when it was lost. Following this trail a second time, witness found his six-shooter where it had been dropped by the person who took it from the witness's house.

Acting upon certain information which he obtained from persons living in the neighborhood, the witness, on the morning after the burglary, went to the town of Mason and sued out a search warrant to search the premises of the defendant. He then went to the defendant's house with Sheriff Butler, and aided in the search, which resulted in the discovery in a trunk of the gold breast-pin, the sleeve buttons, the clothes brush, the four towels, the jack-plane, and the knitting cotton. The sheriff got the trunk key from the defendant's wife. The defendant and his brother Charley were out at the cow pen when the witness and the sheriff first came in view of the house. As soon as he saw the witness and the sheriff, the defendant started off in the direction of his father's house, and passed around his own house as though to avoid the sheriff. The sheriff intercepted and arrested him. While the search of the premises was in progress, the defendant managed to elude Messrs. Ainsworth and Henry, in whose charge the sheriff left him, and escaped. The sheriff and Fritz Leifester pursued him on horseback,

but failed to overhaul him. The house of the defendant was situated about one mile and a half distant from the witness's. The track which the witness followed from his house through the field, and on which he found his six-shooter, led in the direction of the defendant's house. The witness never gave the defendant permission either to enter his house or to take the articles mentioned therefrom. Witness had never recovered the half sack of coffee.

Cross-examined, the witness testified that he was absolutely certain that the articles mentioned as those taken from the defendant's trunk were his, the witness's, and were taken from his house on the 10th day of June, 1884. The defendant was a married man and lived in a house separate from his father, but in the same yard. Witness had known the defendant some three or four years, and believed that the defendant was possessed of enough intelligence to discriminate between right and wrong. The defendant made trades on his own account, and exchanged labor with his neighbors, day for day.

J. C. Butler, sheriff of Mason county, Texas, testified, for the State, that on or about the 12th or 13th day of June, 1884, the witness August Apelt came to the town of Mason and procured warrants for the arrest of the defendant, and for the search of the defendant's house for stolen goods. These warrants were placed in the witness's hands for execution, and the witness, with Apelt and Fritz Leifester, repaired to the defendant's house, which was situated about six miles from town. Just before the house was reached, witness saw the defendant out at his cow lot. When he saw the witness and his party, the defendant scaled his fence and started, by a back way, either to his own or the house of his father, which two houses were situated in the same inclosure about forty yards apart. Witness intercepted the defendant and told him he was under arrest. Defendant, however, refused to stop, even when the witness laid his hand on him, and struggled so violently in his effort to reach the house that he tore his shirt and clothing. Having secured his arrest, the witness left the defendant in charge of James Ainsworth and George Henry, and proceeded to execute the search warrant. The search resulted in the discovery, in the bottom of a large trunk in the defendant's house, of a gold breast-pin, a pair of sleeve buttons, four towels, one jack-plane, one clothes brush, and some knitting cotton; all of which articles Apelt claimed as his property, and to have been taken from his house. Defendant's wife was present. She refused at first to surrender the key to the trunk, declaring that it contained only infants' clothing. After a

long parley witness told the defendant's wife that unless she surrendered the key he would be compelled to take the trunk to Mason. Thereupon she exacted a promise from the witness not to kill the defendant, and gave up the key. While the search of his trunk was in progress, the defendant escaped from his guards and got into his father's house. He presently emerged with a Winchester rifle in his hand, passed back with it through his father's house, and ran off through the fields. Witness and Leifester mounted their horses and attempted to pursue him, but could make no progress horseback over the boggy ground. Defendant made good his escape, but was subsequently, after about six months, recaptured by the witness in San Angelo, about one hundred and twenty miles distant from Mason. If defendant was ever back in Mason county after his escape in 1884, until he was brought back by the witness, the witness did not know it.

James Ainsworth testified that he was at the defendant's house when the latter was arrested for the burglary of Apelt's house in June, 1884. Defendant was left in charge of the witness and George Henry while Sheriff Butler, Apelt and Fritz Leifester were in the house searching for Apelt's missing articles. He ran into his father's house and presently returned to the front door with a Winchester rifle leveled on witness and Henry. He then sprang through a rear window and ran off through a field. Sheriff Butler and Fritz Leifester pursued him on horseback but failed to overtake him. The witness saw the defendant again late that evening, near Valley Springs, in Llano county, which was about fifteen miles distant from his home. He was coming down a mountain when witness first saw him on that evening, the Winchester still in his hands but the butt pointed towards witness. He hallooed to witness, came to the camp where witness and Henry were, laughing, and passed the night in that camp. He said that night that he was sorry he went into August Apelt's house; that Ragety Hampty had two pistols, pulled them out and showed them to him, and then took position and stood watch while he went into Apelt's house. Defendant then asked if the sheriff and Apelt found anything in his house. Witness told him what they found, and he remarked: "Why in the h—ll didn't my wife and Charley hide them so he couldn't find them?" Witness asked him to tell where the half sack of coffee was; that it would do no one any good now, and that if he would tell witness where to find it, he, witness, would get it and return it to Apelt. Defendant replied that the coffee was safe and would do somebody some good, and refused to tell the witness

where it was. Defendant slept that night in the brush about one hundred yards from the camp. He slept on his gun, and, after breakfasting with witness and Henry next morning, went off through the woods. He boasted of his ingenuity in making his escape. He said that while the women folks were "taking on," and he waving his hands as though to quiet them, he kept getting gradually closer to the house of his father until near enough, when he sprang through the door and secured the gun.

George Henry was the next witness for the State. His testimony was almost *verbatim* the same as that of the witness Ainsworth, even to the conversation with the defendant at camp on the night after the escape, about the half sack of coffee, which he related in the same words, as having transpired between himself and defendant.

Fritz Leifester testified, for the State, that he went with Sheriff Butler to the defendant's house to execute a search warrant on the day after the burglary of Apelt's house. Most of the articles claimed by Apelt to have been taken from his house were found in a large trunk in the defendant's house. Witness saw the tracks described by Apelt at Apelt's house, and followed them through a small field and across a branch in the direction of the defendant's house. Witness told Apelt if the burglar was the man whom he suspected, his tracks would be found in the field at the branch spoken of. Accordingly, they went to the branch and found the tracks there. Apelt then went to Mason and sued out papers for the arrest of the defendant and the search of his house.

Cross-examined, the witness testified that he had known the defendant during the past five years, and that, for that time at least, the defendant had borne the reputation of being a petty thief. He had often heard the defendant accused of pilfering small articles. He had, since he had known the defendant, regarded him as a weak-minded man. His mind seemed to run principally on thieving and stealing,— such at least was the witness's opinion, based upon frequent conversations with him. He had often mentioned small articles to the witness and asked witness to what amount bail would be exacted if he stole them, and on one occasion he asked witness if, after stealing a yearling, should he do so, and forfeiting his bond, could he still be prosecuted for the theft. Witness was not on good terms with defendant,— "don't like such fellows."

Re-examined, the witness testified that he had never heard of the defendant returning or paying for anything he had ever stolen, and he was perfectly satisfied that the defendant had ample ability to

comprehend the nature of his acts, and distinguish right from wrong in regard to theft.

Samuel Garnett testified, for the State, that he lived between the houses of defendant and Apelt. Shortly after noon on the day that Apelt's house was burglarized, witness saw a man with a bundle on his back crossing the field, going from the direction of Apelt's house towards defendant's house. That man passed witness's house at a distance of about two hundred yards. Witness was satisfied then, and is satisfied now, that that man was the defendant.

Cross-examined, the witness testified that he had known the defendant for several years. He had never considered him very intelligent, but thought him capable of distinguishing the right from the wrong in regard to the appropriation of other people's property. Defendant was a married man, and attended to his business just as his neighbors did. Witness had frequently exchanged work with him on terms of equality. The State rested.

Charles Watenbaugh testified, for the defense, that he had lived in Mason county some twenty-two years, over twenty of which, or from his early childhood, he had known the defendant. The defendant from his early boyhood was simple-minded, and had never, in the opinion of the witness, been of sound mind. He has always been prone to say and do foolish things. The witness did not regard him sufficiently sound of mind to distinguish right from wrong. He has always been known, during witness's acquaintance with him, as "Crazy Jake."

Wilson Hey, district and county clerk of Mason county, was the next witness for the defense. He testified that during his acquaintance with the defendant, extending over several years, defendant had been known as "Crazy Jake Schuessler." Witness had always regarded him as simple, weak-minded and foolish, but could express no opinion as to his ability of distinguishing the right and wrong of theft.

L. P. Badger testified, for the defense, that he had the defendant in his employ some two or three years prior to this trial, and paid him the ordinary wages for such work as he did. He was a weak-minded, foolish person then, and the witness did not think him capable of distinguishing right from wrong.

Doctor D. J. Grandstaff testified, for the defense, that he was a practicing physician. He had known the defendant for the last seven or eight years, during which time he had frequently met and conversed with him. Witness regarded him as weak-minded. He had, in the opinion of the witness, but little mind. He had some

mind, and perhaps enough to know the moral and legal wrong of theft, but witness could not say positively that he had or had not. He had never treated the defendant for either mental or physical disorder. As a general rule, kleptomaniacs will display no disposition to retain and secrete stolen articles, but will usually, when charged with the theft, either return or pay for the articles, if able.

Doctor C. K. Gatliff testified that he had known the defendant as a weak-minded person for fifteen years at least. Witness could not say that he was unable to distinguish right from wrong as to to theft. Witness had never examined him with reference to his mental organization, but he certainly was not well balanced mentally.

Several witnesses testified, for the State, in rebuttal, that the defendant was possessed of enough mind to know the right or wrong of theft. They had frequently heard of defendant stealing small things, but never heard of his returning or paying for anything he had stolen.

The motion for new trial was based, in part, upon the affidavits of several witnesses, setting forth facts upon which they predicated their belief that the mind of the defendant was so impaired that he was totally unable to distinguish between right and wrong as to the crime of theft. The opinion of the court states the purport of the affidavit of the counsel for the defense in support of the motion for new trial.

*Bridges & Fulton*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

Willson, Judge. We are of the opinion that the court erred in refusing to grant the defendant's motion for a new trial. There was some testimony adduced on the trial which tended to show that the defendant, at the time he is charged with having committed the crime, was of unsound mind, and irresponsible criminally for his acts. It is shown by the affidavit of his counsel that he was averse to and protested against interposing the defense of insanity, and would give no information which would enable them to ascertain the facts as to his mental capacity. Nor could they obtain such information from even the defendant's father, he also being averse to interposing such defense. It is shown by affidavits that, after the defendant's conviction, very material evidence strongly tending

to establish the defense of insanity came to the knowledge of defendant's counsel.

It is true that no diligence had been used by the defendant to discover and produce this testimony. On the contrary, his desire was that such testimony should not be resorted to. If, in fact, the defendant is insane, it could not be expected that he would use diligence to obtain testimony, and the law would not exact it of him. His counsel appear to have used reasonable diligence to obtain testimony, and did obtain some as to his mental condition, and show good reason why they did not produce the testimony which they show can be produced on another trial. This newly-discovered evidence is certainly material, and calculated, we think, to change the result on another trial. It appears to us probable that the defendant is not a responsible person, and we think the law and justice demand that he should have a new trial. Wherefore the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered December 2, 1885.]